CARL A. WESCOTT
8210 E. Via de la Escuela
Scottsdale, CA 85258
*in propria persona*
CARLWSOJ@GMAIL.COM
+1 936 937 2688

# UNITED STATES DISTRICT COURT

## DISTRICT OF DELAWARE

| | |
|---|---|
| CARL A. WESCOTT,<br><br>        Plaintiff,<br><br>    vs.<br><br>SPARKLABS IoT ACCELERATOR FUND, L.P.;<br>SPARKLABS MANAGEMENT, LLC;<br>BERNARD MOON;<br>CHARLES REED ANDERSON;<br>SPARKLABS CONNEX;<br><br>        Defendants.<br><br> + DOES 1 through 50 | Civil Action No.  2 1 - 4 6 2<br><br>**PLAINTIFF'S LEGAL COMPLAINT FOR UNJUST ENRICHMENT; WHISTLEBLOWER RETALIATION; BREACH OF THE DELAWARE UNIFORM TRADE SECRETS ACT; SECURITIES FRAUD; and BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br>JURY TRIAL REQUESTED |

Plaintiff Carl A. Wescott, proceeding *pro se,* complains of Defendants SparkLabs IoT Accelerator Fund, L.P.; SparkLabs Management, LLC; SparkLabs Connex; Charles Reed Anderson, and Bernard Moon, and in support of his complaint, the Plaintiff states as follows:

**PLAINTIFF'S LEGAL COMPLAINT FOR UNJUST ENRICHMENT; WHISTLEBLOWER RETALIATION; BREACH OF THE DELAWARE UNIFORM TRADE SECRETS ACT; SECURITIES FRAUD; and BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**

Page 1

## PARTIES

1. The SparkLabs IoT Accelerator Fund, L.P. ("SparkLabs IoT") is an accelerator fund whose management company, SparkLabs Management LLC, is a Delaware LLC.

2. SparkLabs Management, LLC ("SparkLabs Management"), is the Delaware-based management company for the SparkLabs IoT Accelerator Fund, L.P.

3. Charles Reed Anderson ("Anderson") is a resident of Singapore.

4. Bernard Moon is a resident of Palo Alto, California. Mr. Moon ("Moon") is the Manager of SparkLabs Management, LLC, a Delaware-based LLC.

5. SparkLabs Connex is a new accelerator fund whose domicile is unknown, but whose operations are apparently in Singapore.

## Jurisdiction and Venue

1. Venue is appropriate in this Court for the first two SparkLabs-named entities as SparkLabs Management, LLC is a Delaware-based LLC, and SparkLabs IoT is a Delaware/Cayman fund.

2. Jurisdiction against SparkLabs Connex is proper and can be asserted by this Court because even though SparkLabs Connex is nominally domiciled in Singapore, it is, both operationally and legally, a mere continuation of the Sparklabs IoT accelerator fund which was a Delaware/Cayman fund, managed by a Delaware-based LLC.

3. Alternatively and conjunctively, SparkLabs Connex is the result of a fraudulent transfer of Sparklabs IoT assets for the purpose of frustrating the tort victims and creditors of Sparklabs IoT.

4. This venue is proper for Charles Reed Anderson ("Anderson") as well, and this Court can assert jurisdiction over Mr. Anderson. Delaware's implied consent statute, DEL. CODE ANN. tit. 10, § 366 (2013) applies since Connex is a mere continuation of the Delaware/Cayman-domiciled Sparklabs IoT entity, which was managed by a Delaware LLC, SparkLabs Management, LLC. Anderson is a proper party within the holding of *Hazout v. Tsang Mun Ting*, 134 A.3rd 274 (1016).

5. This Court can assert jurisdiction over Bernard Moon as his relevant acts and non-acts, as Manager of SparkLabs Management, LLC, a Delaware entity, were directed herein. Bernard's further relevant acts and non-acts as a partner of the General Partner of SparkLabs IoT, a Delaware/Cayman fund were also directed herein. Many of Mr. Moon's tortious acts were as agent for SparkLabs Management, the manager of multiple SparkLabs accelerator funds, and their General Partnership, with significant cross-ownership.

**Further allegations regarding DOES and conspiracy between defendants**

6. Upon information and belief, there are even more individual Defendants currently unknown to Plaintiff, who shall emerge with the benefit of legal discovery.

7. Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint, Mr. Moon and Mr. Anderson, as individuals, in addition to acting for himself individually, as well as for the benefit of his respective marital community (if any, per individual case), are and

were acting as the agents, servants, employees, and/or representatives of, and with the knowledge, consent, and permission of, and in conspiracy with, each and all of the Defendants (individual and entities) and within the course, scope, and authority of that agency, service, employment, representation, and conspiracy.

8. Plaintiff further alleges on information and belief that the acts and non-acts of each of the individual Defendants were fully ratified by each and all the Defendants.

9. Specifically, and without limitation, Plaintiff alleges on information and belief that the tortious actions, failures to act, breaches, and negligence alleged herein and attributed to one or more of the specific individual Defendants were approved, ratified, and/or done with the cooperation and knowledge of each and in conspiracy with all other Defendants (individual and corporate).

10. In addition, upon information and belief, there are even more corporate, trust, and other entity type Defendants currently unknown to Plaintiff, which shall emerge with the benefit of legal discovery.

11. Plaintiff is informed and believes and thereon alleges that at times material to this Complaint, SparkLabs IoT, SparkLabs Management, and SparkLabs Connex, in addition to acting for themselves and for their own behalf, was acting as the agent, servant, and/or representative of, and with the knowledge, consent, and permission of, and in conspiracy with each and all of the Defendants (entity and individual) and within the course, scope, and authority of that agency, service, employment, representation, and conspiracy.

12. Plaintiff further alleges on information and belief that the acts and non-acts of each of the entity Defendants were fully ratified by each and all the other Defendants.

13. Specifically, and without limitation, Plaintiff alleges on information and belief that the tortious actions, failures to act, breaches, and negligence alleged herein and attributed to one or more of the specific entity Defendants were approved, ratified, and/or done with the cooperation and knowledge of each and in conspiracy with all other Defendants (individual and corporate).

**Underlying Facts – Background on Accelerator Funds and SparkLabs**

14. Accelerator funds are a type of venture capital fund, with a slightly different model.  Venture capital funds are more hands-off and often later-stage than most accelerator funds and invest almost all their raised capital in companies (minus management fees)  (Exhibit A, Sworn Affidavit of Carl Wescott).

15. Accelerator funds, like Y Combinator (https://www.ycombinator.com/), get involved with startups at an earlier stage than most venture capital investments.  Most accelerator funds invest smaller amounts than venture capital funds per startup (US $30,000 to US $100,000 is a typical investment), at a lower valuation (accelerators often get 6% to 10% of a startup or more), but the accelerator funds invest a lot of time and expertise along with their capital to help guide the startups so they can grow their business and raise further needed capital (Exhibit A, Sworn Affidavit of Carl A. Wescott).

16. Accelerator funds typically group their investments into classes, or cohorts, that they then assist for three to five intensive months, culminating in a Demo Day where each startup in the cohort does a presentation for investors (Exhibit A).

17. The accelerator fund model, when properly executed, has been demonstrated to yield high returns and to generate significant equity in funds and their portfolio companies (Exhibit A).

18. Based on the success of Y Combinator, Tech Stars, 500 Startups, Venture Catalysts, Startup Boot Camp, and other accelerators, there are now thousands of accelerator funds worldwide (Exhibit A).

**Underlying Facts – SparkLabs Group and SparkLabs IoT, prior to SparkLabs Connex**

19. The Plaintiff is a former employee of the SparkLabs Group, and prior to that and in parallel, a mentor at many of the SparkLabs accelerator funds for its portfolio companies (Exhibit A, Sworn Affidavit of Carl Wescott).

20. From SparkLabs' inception in 2012 through mid-2019, the Plaintiff was a mentor at SparkLabs Seoul (funded for those time periods by Korea Fund I and Korea Fund II, two SparkLabs funds), and other SparkLabs accelerators (Exhibit A).

21. Beginning in 2016, the Plaintiff was a Venture Partner at the SparkLabs Group (Exhibit A).

22. In August 2017, Mr. Bernard Moon, founding partner of the SparkLabs Group, offered the Plaintiff a full-time job at the SparkLabs Group, specifically to be the Managing Director and fund manager of the SparkLabs IoT and Smart City accelerator fund ("SparkLabs IoT") (The web site was at www.sparklabsiot.com. The 2019 web site can be viewed at http://web.archive.org/web/20190324090549/http://www.sparklabsiot.com/en/index.php) (Exhibit A).

23. According to Mr. Moon, in private communications with the Plaintiff in 2017, as well as many statements broadcast to the public (such as here https://hackernoon.com/sparklabs-group-a-new-beginning-cf1e49c7afe7), SparkLabs IoT had raised enough money to fund sixteen (16) investments in IoT companies in its first batch (Exhibit A).

24. At the link above, Mr. Moon falsely claims that SparkLabs IoT invested $50,000 in Drop (https://getdrop.com/) – it was actually Korea Fund II that wired those monies, and Drop is a now a Korea Fund II portfolio company (after being moved to the fund that had actually funded the investment in the company in 2018) (Exhibit A).

25. The SparkLabs IoT website, in 2019, viewable today at the link above, still claims to have those sixteen (16) companies in its portfolio (Exhibit A).

26. According to Mr. Moon and other SparkLabs partners and stakeholders in private communications, SparkLabs IoT was to receive about US $1 million a year in grants from the South Korean government (Exhibit A), personally promised by South Korean President Park Geun-hye (Exhibit A).

27. The Plaintiff accepted the job offer and began full-time employment at his new job on October 26th, 2017 (Exhibit A).

28. However, by December 2017, the Plaintiff discovered and figured out that something was amiss at the SparkLabs Group (Exhibit A).

29. More specifically, the Plaintiff discovered that all the statements that Mr. Moon had made to him and the general public about SparkLabs IoT having already raised money and made those 16 investments were lies (Exhibit A).

30. With former South Korean President Park Geun-hye impeached and removed from office (soon to be sentenced to 24 years in prison for corruption, on April 6th, 2018), it did not appear that the grant money President Park had promised would still be coming in (Exhibit A).

31. The SparkLabs IoT General Partner (of the SparkLabs IoT fund, a Limited Partnership) had essentially no money and could not pay the Plaintiff's salary (Exhibit A).

32. The SparkLabs IoT General Partner ("GP") had borrowed over US $700,000 from Korea Fund, II ("KF II"), another SparkLabs accelerator fund, to make the sixteen (16) investments in SparkLabs IoT companies (Exhibit A).

33. While the SparkLabs IoT GP owned the shares and equity in those startups, Korea Fund, II had made all the wires to the companies (Exhibit A).

34. Undisclosed, unapproved inter-fund loans are prohibited by the federal and state securities laws of the United States, in *Rules 17(a) and 10B-5* (Exhibit A).

35. False statements (related to securities offerings) made to investors and prospective investors are also illegal and prohibited by the federal and state securities laws of the United States (Exhibit A).

36. Finally, false statements (related to securities offerings) made to the general public are also illegal and prohibited by the federal and state securities laws of the United States (Exhibit A).

37. Thus, for the SparkLabs IoT fund alone, there were multiple types of securities fraud that the Plaintiff discovered at SparkLabs (Exhibit A).

38. The Plaintiff refused to raise money for the SparkLabs IoT accelerator fund due to the securities fraud issues (Exhibit A).

39. The Plaintiff did not wish to have any involvement with activities that were illegal or immoral (Exhibit A).

40. Later, the Plaintiff refused to raise money for other funds that he discovered also had securities fraud issues (Exhibit A).

41. The Plaintiff did invest some time into raising money towards "clean" funds: funds he believed were not tainted by the securities fraud, but he later realized that even that would be

problematic, as the issues in other SparkLabs funds, that could have a material impact on all of SparkLabs, would have to be disclosed (Exhibit A).

42. In early 2018, to protect SparkLabs investors, the Plaintiff insisted that these securities fraud issues be cleaned up as best as possible. As part of that, the discrepancy between Korea Fund II (that had made the SparkLabs IoT investments) and SparkLabs IoT (that owned shares in 16 portfolio companies but had not paid for them) would need to be fixed (Exhibit A).

43. SparkLabs partners Bernard Moon, Jimmy Kim, and Eugene Kim, most active in these discussions, agreed with the Plaintiff that the above issues would be cleaned up. (SparkLabs partners Hanjoo Kim, Frank Meehan, and Jay McCarthy were copied on emails and were aware of these issues but were less-active participants in these discussions). (Exhibit A)

44. As the second phase of cleanup, the Plaintiff also insisted on a new clean fund to be set up (not tainted by securities fraud), full disclosure to investors, the SEC, the public, and other necessary stakeholders. The Plaintiff suggested that a new law firm be retained to further investigate and advise on what needed to be done, and to coordinate those activities until complete (Exhibit A).

45. In 2018 and early 2019, the Plaintiff worked with Eugene Kim, Jimmy Kim, and others to inform the sixteen (16) portfolio companies what had happened, and to move/correct issued shares, investor agreements, and capitalization tables to reflect that Korea Fund II had made the 16 IoT company investments, and not SparkLabs IoT (Exhibit A).

46. Because there was not much for the Plaintiff to do in his original expected job as the Managing Director of SparkLabs IoT (as there was no money to invest, due to the securities fraud issues), the Plaintiff was instead requested to do many more things to help many other SparkLabs accelerators and dozens of portfolio companies (Exhibit A).

47. Among other tasks, the Plaintiff helped portfolio companies market and sell, helped founders get their visas, wrote up investment documents, did outreach to various communities, attended many events and conferences on behalf of SparkLabs (including GAN events), sourced deal flow, and evaluated investment opportunities (Exhibit A).

48. The Plaintiff also worked on setting up two new accelerators in Singapore, supported every operating and nascent accelerator fund, and came up with two new programs for SparkLabs: (1) Blitzscaling (or speedscaling), and as part of that, (2) a program to help portfolio companies market and sell in to various industries worldwide. (SparkLabs fully endorsed, adopted, and rolled out the Blitzscaling initiative, which continues to this day, after the Plaintiff's departure) (Exhibit A).

49. The Plaintiff participated in conferences, created content, recruited general partners and mentors, put together panels on robotics and quantum computing, and interviewed investors and entrepreneurs, including on stage at Demo Days and special events. The Plaintiff successfully recruited desirable panel speakers for other events, including a kickoff to recruit institutional investors in Hong Kong (where Jeff Clavier participated, leading to him participating in other events, and then Mr. Clavier's firm leading a multimillion dollar investment in a SparkLabs portfolio company (Exhibit A).

50. The Plaintiff also acted as a "concierge" to some of founders and program directors of some of the newer SparkLabs accelerator funds, assisting with all aspects of their operations depending on their needs. The Plaintiff helped individual portfolio companies with their pitches, outreach, designs, engineering issues, strategy, recruiting, branding, marketing and sales (Exhibit A).

51. However, in early March 2019, in a brief phone call, Bernard Moon informed the Plaintiff that SparkLabs was not going to shut down the current tainted SparkLabs IoT fund, was not going to start a new clean fund, and was not going to retain a new law firm nor disclose what had happened. (Phone records will show the exact date of that phone call). (Exhibit A)

52. In response, in that same phone call, the Plaintiff then threatened to whistleblow and tip off the SEC and law enforcement as to the securities fraud. Mr. Moon hung up the call. Upon information and belief, at that point, Mr. Moon decided to fire the Plaintiff in retaliation for insisting that the securities fraud be cleaned up, and in retaliation for threatening to tip off and whistleblow the SparkLabs securities fraud issues to the SEC and to law enforcement (Exhibit A).

53. Upon information and belief, as further detailed in the Case Summary in Exhibit A, the Plaintiff now believes that right after the early March 2019 phone call, Mr. Moon and other SparkLabs Groups partners also decided to discredit the Plaintiff and to blacklist and blackball him (Exhibit A).

54. In another phone call with Mr. Moon in approximately May 2019 (phone records will show the exact date and time), when Mr. Moon was briefly in Ireland on a business trip, Mr. Moon referred to what the Plaintiff had done as a "dirty trick", and told the Plaintiff:

- That he (Bernard Moon) would ensure that the Plaintiff would be erased from all SparkLabs records as if the Plaintiff did not exist (the Plaintiff still does not understand that threat, but hopefully this does not mean that Mr. Moon and partners destroyed evidence).

- That Mr. Moon and the SparkLabs Group would terminate all personal and professional relationships with the Plaintiff.

- That Mr. Moon and the SparkLabs Group would "expose" the Plaintiff as a liar and a fraud.
- That Mr. Moon and the SparkLabs Group would do everything they could to ensure that the Plaintiff could not work in venture capital, with accelerator funds, and with startups ever again.
- That Mr. Moon and the SparkLabs Group would do everything they could to discredit the Plaintiff and ruin his career... and that the Plaintiff would "die in poverty." (Exhibit A)

55. Obviously, given Mr. Moon's rant, and his raised voice, Mr. Moon was not happy with the Plaintiff (Exhibit A).

56. In May 2019, Augmented Knowledge, a SparkLabs portfolio company, changed the Plaintiff's salary to $0. (The Plaintiff was an officer of the company and a full-time employee – he had taken a second job with Augmented Knowledge as interim CEO, and then CMO, with all parties' permission) (Exhibit A).

57. Mr. Jimmy Kim, co-founder and partner of the SparkLabs Group, was the *seonbae* (선배) of Dr. Geun-Sik Jo, founder of Augmented Knowledge. A *seonbae* is the Korean equivalent to the Japanese concept of *senpai*, someone who is your senior (not necessarily in age), who you respect, who helps guide you, and, like your parents, who you not only respect, but obey most of the time (Exhibit A).

58. The Plaintiff was supposed to go to Miami in mid-May 2019 to help market and sell Augmented Knowledge at a conference, but Mr. Moon didn't send him the $1000 Mr. Moon had promised for expenses (Exhibit A).

59. The Plaintiff had planned to resign from Augmented Knowledge, after the conference, given his new salary "downgrade" to $0, but given that he didn't have enough money for the Miami trip, he just resigned from his full-time job at Augmented Knowledge at that point (Exhibit A).

60. On June 20th, 2019, Mr. Moon emailed the Plaintiff firing him from his full-time job at the SparkLabs Group.  The Plaintiff's salary remains unpaid (Exhibit A).

61. The Plaintiff had two weeks of SparkLabs commitments he had made where people depended on him, including over 10 days with various commitments in Seoul, so he proposed a last day of July 4th, 2019 (Exhibit A).

62. On June 23rd, 2019, the Plaintiff travelled to Seoul, Korea.  SparkLabs had paid for a week of hotel for the Plaintiff, with a non-refundable payment.  SparkLabs cancelled his non-refundable hotel rooms (Exhibit A).

63. SparkLabs disinvited him from its Demo Day events, which are open to the public (Exhibit A).

64. One of the reasons the Plaintiff travelled to Seoul was to give a talk at a local university (Inha University) on June 28th, 2019 on entrepreneurship, arranged by Dr. Geun-Sik Jo, founder of Augmented Knowledge (Exhibit A).

65. Dr. Jo was paying a $800 honorarium and promised to reimburse some of the Plaintiff's travel expenses (e.g. hotel rooms, as SparkLabs had already paid for the Plaintiff's airfare) (Exhibit A).

66. Two days before the talk, after the Plaintiff had already travelled to Seoul to give the talk, Dr. Jo cancelled the talk.  No honorarium was paid, and the Plaintiff's expenses remain unreimbursed.

67. Because Mr. Jimmy Kim is Dr. Jo's *seonbae* (선배), the Plaintiff believes that it was Mr. Kim who (at Bernard Moon's request or in conjunction with Mr. Kim) ordered Dr. Jo to reduce the

Plaintiff's salary to $0, not pay his salary, cancel his arranged Seoul talk at the last minute, and not reimburse his expenses as promised (Exhibit A).

**Base Damages Owed by SparkLabs IoT and its partners**

70. The Plaintiff invested US $50,000 in SparkLabs IoT in 2016 (in exchange for 3% of the entity), before later discovering Mr. Moon's and the partnership's securities fraud. The Plaintiff is not seeking those damages in this complaint, and he believes he is entitled to 3% of Korea Fund II, the fund that actually made the investments that SparkLabs IoT claimed to make. The Plaintiff will address that in a separate legal complaint with SparkLabs Korea General Partner II, L.P.

71. SparkLabs IoT and the partners and partnership of SparkLabs IoT, as well as its successor owe the Plaintiff $265,650.68 in salary as of July 4th, 2019.

72. As 90%+ of the Plaintiff's compensation should have flowed to him from carried interest in the SparkLabs IoT General Partnership, of which the Plaintiff held 36 to 39% of the partnership at various times, the Plaintiff is owed a much larger sum that he should have earned but for the securities fraud perpetrated by Mr. Moon and his partners. (In other words, if SparkLabs IoT really had made the sixteen (16) investments in IoT companies as Mr. Moon claimed, and if SparkLabs IoT had really had the US $1 million in Korean government grant money for the Plaintiff to invest, garnering results like those of other SparkLabs accelerator funds, then the Plaintiff should have made a much larger sum up through July 4th, 2019, to be fully proven at trial.

73. Had the Plaintiff not been wrongfully terminated in June/July 2019 in retaliation for threatening to whisteblow, and whistleblowing said securities fraud to the SEC, DBO, and other regulatory

and law enforcement agencies, the Plaintiff would have made another larger sum, to be fully proven at jury trial.

**Connex is formed to defraud SparkLabs IoT creditors and tort victims, including the Plaintiff**

74. Connex is best described as: SparkLabs IoT with Groucho glasses.

75. By 2019, Moon was aware that SparkLabs IoT had incurred very substantial legal liabilities to investors and the Plaintiff and might well be the object of regulatory action.

76. Spark Labs IoT had also incurred significant indebtedness to the Plaintiff for the value of his services and his intellectual property.

77. Even worse, from Moon's perspective, is that his partners had been informed by the Plaintiff of the Spark Labs IoT legal and regulatory issues. The Plaintiff sent correspondence to his partners beginning in June and July of 2019, continuing later in 2019, and in 2020, giving them the opportunity to repudiate or ratify the fraudulent acts of Moon and other insiders.

78. Moon apparently persuaded his partners that Groucho glasses would solve their problems, and that rather than making things right and taking care of their obligations, that the partners should double down on the securities fraud, perjury, forgery, wage theft and other crimes committed, and now expand in to other areas of fraud.

79. Accordingly, though the Plaintiff did not discover this until recently, in late February of 2020, Sparklabs announced the birth of SparkLabs Connex which in turn:

    (a) Kept the same main partners;
    (b) Maintained the same investment focus (IoT);
    (c) Had the same 3 venture partners and;
    (d) Mostly kept the same business model as SparkLabs IoT;
    (e) But also retained the benefit of the Plaintiff's services and intellectual property. (Collectively "the Indicia of Continuity").

80. In contrast the differences between SparkLabs IoT and Connex were basically as follows:

    (a) SparkLabs IoT was now called "Connex" to confuse creditors, their tort victims and Plaintiffs;

    (b) Spark Labs IoT, aka Connex was physically moved to Singapore to interpose nominal jurisdictional hurdles for creditors, tort victims, and plaintiffs.

81. The question for this Court is essentially whether the flim-flam man can evade liability by skipping town and changing his name. Delaware law suggests otherwise. *Societe Anonyme Dauphitex,* 2007 WL 3253592, at *6 (quoting 15 W. Fletcher, Cylopedia of the Law of Private Corporations § 7124.10 (perm ed., rev. vol. 1999).

82. Alternatively and conjunctively, the shifting of tangible and intangible assets from SparkLabs IoT to SparkLabs Connex is a fraudulent transfer under Delaware law as it was undertaken for the transparent purpose of frustrating creditors and tort victims[1]. *Quadrant Structured Prods. Co., Ltd. v. Verlin, C.A.* No. 6990, 2014 WL 5099428, at *31 (Del. Ch. Oct. 1, 2014), construing the Delaware Uniform Fraudulent Transfer Act, 6 DEL. C. §§ 130l(l)(a)-(d); (7)(b),(d); (9).

83. Relatedly, the same theory of fraudulent transfer justifies piercing the SparkLabs Connex corporate veil and imposing direct personal liability on the partners, officers and directors. *Fringer v. Kersey Homes, Inc., C.A.* No. 9780-VCG (Del. Ch. June 25, 2018).

84. Accordingly, the individual defendants are subject to the jurisdiction of this Court and jointly and severally liable with Connex.

---

[1] Under Section 1304(a)(1) of DUFTA, (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation(1) with actual intent to hinder, delay or defraud any creditor of the debtor.

85. (More individual defendants shall be confirmed via discovered, added to the legal complaint via Court-approved amendment, and served as well)

86. Under the Seventh Amendment to the United States Constitution, the Plaintiff has a right to a jury trial for his Constitutionally-protected petitioning rights. (Also, as per *Fed. R. Civ. P 38(b)*).

87. The Plaintiff hereby respectfully requests a jury trial on all issues raised herein, including all triable facts and issues related to his current causes of action and any facts, issues, requests, and/or causes of action that the Plaintiff or his future attorney may add within the timelines allowed by this Court.

**Count I – Unjust Enrichment**

88. The Plaintiff realleges paragraphs 1-87 as if fully set out herein.

89. The Defendants in this case were enriched by the value of the Plaintiff's services including his labor, expertise and intellectual property.

90. The Plaintiff was impoverished by the loss of thousands of hours of professional services as well as the Defendants' exploitation of his expertise and intellectual property.

91. The Defendants' enrichment and the Plaintiff's impoverishment were directly and inextricably linked.

92. The Defendants have no justification for retaining the benefits of the Plaintiff's services, expertise and intellectual property without paying him.

93. There is no other adequate remedy at law for the Plaintiff.

94. The Defendants in equity and good conscience should pay the Plaintiff the reasonable (market) value of his services, expertise and intellectual property as benchmarked by prevailing practice by the Defendants and peer accelerators in an amount to be determined at trial.

95. In the alternative, the Defendants should pay the Plaintiff his promised salary as part of the base damages, and the incentive compensation he should have earned, in an amount to be proven at trial.

**Count II – Whistleblower Retaliation (California Labor Code 1102.5)**

96. The Plaintiff realleges paragraphs 1-87 as if fully set out herein.

97. While employed at SparkLabs IoT, the Plaintiff engaged in protected activity (e.g. insisting that securities fraud be cleaned up, threatening to whistleblow securities fraud to the SEC and DBO and others, ultimately reporting securities fraud by SparkLabs IoT and many other SparkLabs funds to the SEC, DBO, and other regulatory and law enforcement agencies.

98. The Plaintiff subsequently suffered adverse employment consequences including termination and the confiscation of salary and expenses ("the Adverse Consequences").

99. The Adverse Consequences were directly related to the Plaintiff's protected activities.

100.    The Plaintiff believes that California law is properly applied to this Count, since though he was employed by a Delaware entity, the Plaintiff was recruited and retained in California and performed his full-time services in California as well as in South Korea.  The Plaintiff was fired in retaliation for the threatened whistleblowing in California, by a California resident (Bernrd Moon) while both were in California.

101.    However, in the alternative, the Delaware Whistleblower Protection Act, 74 Del. Laws: 1 et seq provides substantially the same protection and remedy.

102.    Either way, whichever Whistleblower Retaliation statute is employed, the Defendants in equity and good conscience should pay the Plaintiff the reasonable (market) value of his services, expertise and intellectual property as benchmarked by prevailing practice by the Defendants and peer accelerators in an amount to be determined at trial.

103.    In the alternative, the Defendants should pay the Plaintiff his promised salary as part of the base damages, and the incentive compensation he should have earned, in an amount to be proven at trial.

104.    Finally, as the Whistleblower Retaliation was also a Wrongful Termination, the Defendants should pay the Plaintiff the amounts he should have made from his June/July 2019 termination through the present, in an amount to be fully determined at trial.

## Count III – Breach of Delaware Uniform Trade Secrets Act

105.    The Plaintiff realleges paragraphs 1-87 as if fully set out herein.

106.    The Plaintiff possessed proprietary know-how including processes, techniques, customer lists, his rolodex and compilations of information that are trade secrets within the definition of the Delaware Uniform Trade Secrets Act, 6 DE Code 2001 (4)(a) & (b) ("Plaintiff's Intellectual Property").

107.   The Defendants induced the Plaintiff to disclose Plaintiff's Intellectual Property by improper means, including but not limited to, the misrepresentation that the Plaintiff would be paid a salary and have his expenses reimbursed.

108.   SparkLabs IoT and its mere continuation Connex as well as the other Defendants have collectively misappropriated the Plaintiff's Intellectual Property and Defendants, including successor continuation Connex wrongfully retain the benefits of the Plaintiff's know-how, techniques, processes and contacts.

### Count IV – Securities Fraud – Cal. Corp. Code 25401

109.   The Plaintiff realleges paragraphs 1-87 as if fully set out herein.

110.   The Plaintiff obtained a carried interest ("the Carried Interest") in the SparkLabs IoT Fund in exchange for valuable services and the cancellation of undisputed debt. As a mere continuation of SparkLabs IoT, Connex and its owners are responsible for all wrongful acts and non-acts committed by SparkLabs IoT against the Plaintiff, including those acts and non-acts committed by Moon as agent for SparkLabs IoT or SparkLabs Connex.

111.   The Carried Interest was a security within the definition of California Corporations Code 25019 as anticipated profit participation. California law should be applied to this cause of action because the transaction took place in California, as well as Moon's fraudulent acts related thereto.

112.   At the time the Defendants induced the Plaintiff to provide valuable consideration for the Carried Interest, the Defendants omitted to disclose that they had co-mingled investor funds in

the SparkLabs IoT Fund (and that Korea Fund II had funded all of the investments that Moon and his partners claimed were made by SparkLabs IoT) which were acts of securities fraud rendering the Carried Interest worthless as a practical matter ("the Defendants' Omission")

113.    The Defendants' Omission would have been material to a reasonable investor and was in fact material to the Plaintiff.

114.    The Plaintiff has been damaged by the Defenants' Omissions by losing the value of the Carried Interest which should have represented millions of dollars in expected income.

### Count V – Breach of the Implied Covenant of Good Faith and Fair Dealing

115.    The Plaintiff realleges paragraphs 1-87 as if fully set out herein.

116.    Under Delaware law (and under California law, to the extent that it's relevant) there is an implied covenant of good faith and fair dealing imputed into every contract in which the contracting party promises not to act or exercise discretion in such a way as to deprive a counterparty of the expected benefits of the bargain.

117.    The Plaintiff's employment contract contained an implied covenant of good faith and fair dealing.

118.    The Defendants breached the implied covenant of good faith and fair dealing in the Plaintiff's employment contract by co-mingling investor funds in the SparkLabs IoT Fund with Korea Fund II, making it impossible, as a practical matter, for the Plaintiff to obtain his contractually expected compensation including his salary Carried Interest.

119. This is because rather than taking over a healthy fund that had made sixteen investments (16) and had another million dollars ready at the time of the Plaintiff's start, with at least another million dollars coming in per year in grant money from the Korean government for the Plaintiff to invest on behalf of SparkLabs IoT, the Plaintiff became Managing Director of a toxic sham that had no funds to invest, and significant civil and criminal liability by Moon and his partners.

120. As the mere continuation of SparkLabs IoT, Connex and its owners are responsible for all acts of bad faith and related breaches committed by SparkLabs IoT, Moon, and SparkLabs Management LLC.

121. The Plaintiff has been damaged by the Defendants' violation of the Covenant of Good Faith and Fair Dealing by losing the value of his promised salary as well as the promised Carried Interest which represented millions of dollars in expected income through the present, in an amount to be fully proven at jury trial.


WHEREFORE the Plaintiff prays:


(a) As to Count I for all damages sustained by the Plaintiff as a result of the Defendants' unjust enrichment as well as the disgorgement of any consequential profits earned by the Defendants;

(b) As to Count II for all damages proximately caused by the Defendants' retaliation against the Plaintiff for protected activity including statutory damages under California Labor Code 1102.5 which include back pay; "front pay"; a penalty of $10,000 for each

violation; emotional pain and suffering, recoverable because the retaliation for securities fraud whistleblowing violates fundamental public policy; and reasonable legal and paralegal fees;

(c) As to Count III for all damages caused by the Defendants' misappropriation of the Plaintiff's trade secrets including the greater of the: (a) actual profit; (b) actual loss or; (c) a reasonable royalty along with treble damages for willfulness and fraud and reasonable legal fees and paralegal fees;

(d) As to Count IV for damages under California Corporations Code 25401 including the full value of the Carried Interest but for the co-mingling and the Plaintiff's full benefit of the bargain damages, and for the imposition of exemplary damages to punish and deter future acts of securities fraud by the Defendants;

(e) As to Count V for all damages caused by the Defendants' breaches of the covenant of good faith and fair dealing as well as for the imposition of exemplary damages sufficient to deter future acts of bad faith by the Defendants;

(f) For the costs and out of pocket expenses of this suit;

(g) For the reasonable compensation for the time the Plaintiff has incurred in self-representation (*quantum merit*), as due to not being paid by SparkLabs, he cannot yet afford an attorney;

(h) For paralegal's fees;

(i) For future attorney's fees to help the Plaintiff take this case to jury trial.

(j) For such other and further relief as this Court deems just.

1

2   RESPECTFULLY SUBMITTED on Monday March 29th, 2021

3

4

5

6   _____

    CARL A. WESCOTT, *pro se*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26