CARL A. WESCOTT
8210 E. Via de la Escuela
Scottsdale, CA 85258
*in propria persona*
CARLWSOJ@GMAIL.COM
+1 936 937 2688

# UNITED STATES DISTRICT COURT
# DISTRICT OF DELAWARE

| | |
|---|---|
| CARL A. WESCOTT,<br><br>Plaintiff,<br><br>vs.<br><br>SPARKLABS IoT ACCELERATOR FUND, L.P.;<br>SPARKLABS MANAGEMENT, LLC;<br>BERNARD MOON;<br>CHARLES REED ANDERSON;<br>SPARKLABS CONNEX; | **EXHIBIT A: SWORN AFFIDAVIT OF CARL WESCOTT** |

I, Carl Wescott, hereby swear under penalty of perjury of the laws of Delaware and of the United States of America, that the following facts are true, to the best of my memory, recollection, and belief:

1. I am 53 years old, and a resident of Scottsdale, Arizona.

2. I am competent to testify. Were I to be called to testify in this matter, my testimony would be as follows, and until that point, my written testimony is as such:

    a. First, I hereby verify all the facts in my legal complaint as being true.

**EXHIBIT A: SWORN AFFIDAVIT OF CARL WESCOTT**

1

3. I am currently a resident of Scottsdale, Arizona.

**Underlying Facts – Background on Accelerator Funds**

4. Accelerator funds are a type of venture capital fund, with a slightly different model. Venture capital funds are more hands-off and often later-stage than most accelerator funds and invest almost all their raised capital in companies (minus management fees)

5. Accelerator funds, like Y Combinator (https://www.ycombinator.com/), get involved with startups at an earlier stage than most venture capital investments. Most accelerator funds invest smaller amounts than venture capital funds per startup (US $30,000 to US $100,000 is a typical investment), at a lower valuation (accelerators often get 6% to 10% of a startup or more), but the accelerator funds invest a lot of time and expertise along with their capital to help guide the startups so they can grow their business and raise further needed capital.

6. Accelerator funds typically group their investments into classes, or cohorts, that they then assist for three to five intensive months, culminating in a Demo Day where each startup in the cohort does a presentation for investors.

7. The accelerator fund model, when properly executed, has been demonstrated to yield high returns and to generate significant equity in funds and their portfolio companies.

8. Based on the success of Y Combinator, Tech Stars, 500 Startups, Venture Catalysts, Startup Boot Camp, and other accelerators, there are now thousands of accelerator funds worldwide.

**EXHIBIT A: SWORN AFFIDAVIT OF CARL WESCOTT**

2

**Underlying Facts – SparkLabs Group and SparkLabs IoT**

9. I am a former employee of the SparkLabs Group, and prior to that and in parallel, I was a mentor at many of the SparkLabs accelerator funds for its portfolio companies.

10. From SparkLabs' inception in 2012 through mid-2019, I was a mentor at SparkLabs Seoul (funded for those time periods by Korea Fund I and Korea Fund II, two SparkLabs funds), and other SparkLabs accelerators.

11. Beginning in 2016, I was a Venture Partner at the SparkLabs Group.

12. In August 2017, Mr. Bernard Moon, founding partner of the SparkLabs Group, offered me a full-time job at the SparkLabs Group, specifically to be the Managing Director and fund manager of the SparkLabs IoT and Smart City accelerator fund ("SparkLabs IoT").

13. The SparkLabs' web site was at www.sparklabsiot.com. The 2019 web site can be viewed at http://web.archive.org/web/20190324090549/http://www.sparklabsiot.com/en/index.php.

14. According to Mr. Moon, in private communications with me in 2017, as well as many statements Mr. Moon broadcast to the public (such as here https://hackernoon.com/sparklabs-group-a-new-beginning-cf1e49c7afe7), SparkLabs IoT had raised enough money to fund sixteen (16) investments in IoT companies in its first batch.

15. At the link above, Mr. Moon falsely claims that SparkLabs IoT invested $50,000 in Drop (https://getdrop.com/).

16. It was actually Korea Fund II that wired those monies, and Drop is a now a Korea Fund II portfolio company (after being moved to the fund that had actually funded the investment in the company in 2018).

3

**EXHIBIT A: SWORN AFFIDAVIT OF CARL WESCOTT**

17. The SparkLabs IoT website, in 2019, viewable today at the link above, still claims to have those sixteen (16) companies in its portfolio.

18. According to Mr. Moon and other SparkLabs partners and stakeholders in private communications (in 2017 and late 2016), SparkLabs IoT was to receive about US $1 million a year in grants from the South Korean government, personally promised by South Korean President Park Geun-hye.

19. I accepted Mr. Moon's job offer and began full-time employment at my new job on October 26th, 2017.

20. However, by December 2017, I discovered and figured out that something was amiss at the SparkLabs Group.

21. More specifically, I discovered that all the statements that Mr. Moon had made to me and the general public about SparkLabs IoT having already raised money and made those 16 investments were lies.

22. With former South Korean President Park Geun-hye impeached and removed from office (soon to be sentenced to 24 years in prison for corruption, on April 6th, 2018), it did not appear that the grant money President Park had promised would still be coming in.

23. The SparkLabs IoT General Partner (of the SparkLabs IoT fund, a Limited Partnership) had essentially no money and could not pay my salary.

24. The SparkLabs IoT General Partner ("GP") had borrowed over US $700,000 from Korea Fund, II ("KF II"), another SparkLabs accelerator fund, to make the sixteen (16) investments in SparkLabs IoT companies.

**EXHIBIT A:  SWORN AFFIDAVIT OF CARL WESCOTT**

4

25. While the SparkLabs IoT GP owned the shares and equity in those startups, Korea Fund II had made all the wires to the companies.

26. Undisclosed, unapproved inter-fund loans are prohibited by the federal and state securities laws of the United States, in *Rules 17(a) and 10B-5*.

27. False statements (related to securities offerings) made to investors and prospective investors are also illegal and prohibited by the federal and state securities laws of the United States, as I understand it.

28. Finally, false statements (related to securities offerings) made to the general public are also illegal and prohibited by the federal and state securities laws of the United States.

29. Thus, for the SparkLabs IoT fund alone, there were multiple types of securities fraud that I discovered at SparkLabs.

30. I refused to raise money for the tainted SparkLabs IoT accelerator fund due to the securities fraud issues.

31. I did not wish to have any involvement with activities that were illegal or immoral.

32. Later, I refused to raise money for other funds that I discovered also had securities fraud issues (including one fund that I started to raise money for, before discovering it was a "feeder" to other tainted funds).

33. I did invest some time into raising money towards "clean" funds: funds I believed were not tainted by the securities fraud.

34. I later realized that even that would be problematic, as the issues in other SparkLabs funds, that could have a material impact on all SparkLabs, would have to be disclosed.

**EXHIBIT A: SWORN AFFIDAVIT OF CARL WESCOTT**

5

35. In early 2018, to protect SparkLabs investors, I insisted that these securities fraud issues be cleaned up as best as possible.

36. As part of that, the discrepancy between Korea Fund II (that had made the SparkLabs IoT investments) and SparkLabs IoT (that owned shares in 16 portfolio companies but had not paid for them) would need to be fixed.

37. SparkLabs partners Bernard Moon, Jimmy Kim, and Eugene Kim, most active in these discussions, agreed with me that the above issues would be cleaned up.

38. SparkLabs partners Hanjoo Kim, Frank Meehan, and Jay McCarthy were copied on emails and were aware of these issues but were less-active participants in these discussions.

39. As the second phase of cleanup, I also insisted on a new clean fund to be set up (not tainted by securities fraud), full disclosure to investors, the SEC, the public, and other necessary stakeholders.

40. I suggested that a new law firm be retained to further investigate and advise on what needed to be done, and to coordinate those activities until complete.

41. In 2018 and early 2019, I worked with Eugene Kim, Jimmy Kim, and others to inform the sixteen (16) portfolio companies what had happened, and to move/correct issued shares, investor agreements, and capitalization tables to reflect that Korea Fund II had made the 16 IoT company investments, and not SparkLabs IoT.

42. Because there was not much for me to do in my original expected job as the Managing Director of SparkLabs IoT (as there was no money to invest, due to the securities fraud issues), I was instead requested to do many more things to help many other SparkLabs accelerators and dozens of portfolio companies.

**EXHIBIT A:  SWORN AFFIDAVIT OF CARL WESCOTT**

43. Among other tasks, I helped portfolio companies market and sell, helped founders get their visas, wrote up investment documents, did outreach to various communities, attended many events and conferences on behalf of SparkLabs (including GAN events), sourced deal flow, and evaluated investment opportunities.

44. I also worked on setting up two new accelerators in Singapore, supported every operating and nascent accelerator fund, and came up with two new programs for SparkLabs: (1) Blitzscaling (or speedscaling), and as part of that, (2) a program to help portfolio companies market and sell in to various industries worldwide. (SparkLabs fully endorsed, adopted, and rolled out the Blitzscaling initiative, which continues to this day, after I's departure).

45. I participated in conferences, created content, wrote articles, recruited general partners and mentors, put together panels on robotics and quantum computing, and interviewed investors and entrepreneurs, including on stage at Demo Days and special events.

46. I successfully recruited desirable panel speakers for other events, including a kickoff to recruit institutional investors in Hong Kong (where Jeff Clavier participated at my suggestion and invitation that he accepted), leading to him participating in other events, and then Mr. Clavier's firm (now called Uncorked Capital) leading a multi-million dollar investment in a SparkLabs portfolio company.

47. I also acted as a "concierge" to some of founders and program directors of some of the newer SparkLabs accelerator funds, assisting with all aspects of their operations depending on their needs. I helped individual portfolio companies with their pitches, outreach, designs, engineering issues, strategy, recruiting, branding, marketing and sales.

48. However, in early March 2019, in a brief phone call, Bernard Moon informed me that SparkLabs was not going to shut down the current tainted SparkLabs IoT fund, was not going to start a new clean fund, and was not going to retain a new law firm nor disclose what had happened. (Phone records will show the exact date of that phone call).

49. In response, in that same phone call, I then threatened to whistleblow and tip off the SEC and law enforcement as to the securities fraud. Mr. Moon hung up the call.

50. Upon information and belief, at that point, Mr. Moon decided to fire me in retaliation for insisting that the securities fraud be cleaned up, and in retaliation for threatening to tip off and whistleblow the SparkLabs securities fraud issues to the SEC and to law enforcement.

51. Upon information and belief, as further detailed in the Case Summary in Exhibit A, I now believe that right after the early March 2019 phone call, Mr. Moon and other SparkLabs Groups partners also decided to discredit me and to blacklist and blackball me.

52. In another phone call with Mr. Moon in approximately May 2019 (phone records will show the exact date and time), when Mr. Moon was briefly in Ireland on a business trip, Mr. Moon referred to what I had done as a "dirty trick", and told me:

- That he (Bernard Moon) would ensure that I would be erased from all SparkLabs records as if I did not exist (I still do not understand that threat, but hopefully this does not mean that Mr. Moon and partners destroyed evidence);
- That Mr. Moon and the SparkLabs Group would terminate all personal and professional relationships with me;
- That Mr. Moon and the SparkLabs Group would "expose" me as a liar and a fraud;

8

**EXHIBIT A: SWORN AFFIDAVIT OF CARL WESCOTT**

- That Mr. Moon and the SparkLabs Group would do everything they could to ensure that I could not work in venture capital, with accelerator funds, and with startups ever again;
- That Mr. Moon and the SparkLabs Group would do everything they could to discredit me and ruin my career… and that I would "die in poverty."

53. Obviously, given Mr. Moon's rant, and his raised voice, Mr. Moon was not happy with me.

54. On June 20th, 2019, Mr. Moon emailed me firing me from my full-time job at the SparkLabs Group. My salary remains unpaid.

55. I had two weeks of SparkLabs commitments I had made where people depended on me, including over 10 days with various commitments in Seoul, so I proposed a last day of July 4th, 2019.

56. On June 23rd, 2019, I travelled to Seoul, Korea (the flights had been purchased long ago). SparkLabs had paid for a week of hotel at the COEX Intercontinental for me, with a non-refundable payment.

57. SparkLabs cancelled my non-refundable hotel rooms.

58. SparkLabs disinvited me from its Demo Day events, which are open to the general public.

59. I was told not to come, so I was the only person out of 8 billion people on the planet that was not welcome.

60. One of the reasons I travelled to Seoul was to give a talk at a local university (Inha University) on June 28th, 2019 on entrepreneurship, arranged by Dr. Geun-Sik Jo, founder of Augmented Knowledge.

61. Dr. Jo had promised to pay me a $800 honorarium and promised to reimburse some of my travel expenses (hotel rooms, as SparkLabs had already paid for my airfare).

**EXHIBIT A: SWORN AFFIDAVIT OF CARL WESCOTT**

9

62. Two days before the talk, after I had already travelled to Seoul to give the talk, Dr. Jo cancelled the talk.

63. No honorarium was paid, and my expenses remain unreimbursed.

64. Because Mr. Jimmy Kim is Dr. Jo's *seonbae* (선배), I believe that it was Mr. Kim who (at Bernard Moon's request or in conjunction with Mr. Kim) ordered Dr. Jo to reduce my salary to $0, not pay my salary, cancel my arranged Seoul talk at the last minute, and not reimburse my expenses as promised.

65. My salary and other promised compensation remains unpaid, and my expenses from my most recent time periods are also unpaid.

66. To right the scales of justice, I was forced to take the step of filing a legal complaint to gather relevant evidence and to get to a jury trial in 2022 or 2023 where I will prove the culpability of the defendants as well as the corresponding damages.

FURTHER AFFIANT SAYETH NAUGHT

Monday March 29th, 2021

CARL A. WESCOTT, *pro se*

10

**EXHIBIT A: SWORN AFFIDAVIT OF CARL WESCOTT**